IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WAFFLE HOUSE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>TREETOP ENTERPRISES, INC.; EZELL, LLC; E.E.E., LLC; W.C. EZELL, LLC; and J.C. EZELL, LLC,<br><br>Defendants. | ) | CIVIL ACTION FILE<br><br>NO. _______________ |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Plaintiff, Waffle House, Inc. ("Waffle House" or "Plaintiff"), states its Complaint against Defendants, Treetop Enterprises, Inc. ("Treetop"), Ezell, LLC, E.E.E., LLC, W.C. Ezell, LLC, and J.C. Ezell, LLC (Treetop, Ezell, LLC, E.E.E., LLC, W.C. Ezell, LLC, and J.C. Ezell, LLC are referred to collectively herein as "Ezell"), as follows:

## INTRODUCTION

1.

Waffle House has been in business since Labor Day 1955. It is a nationally recognized operator/franchisor of Waffle House restaurants. As of June 1, 2011, Waffle House and its wholly owned subsidiaries operate 1,207 restaurants and its

independently owned franchisees operate 396 restaurants. With respect to certain of its restaurants which in the past were, or currently are, operated by a franchisee (including specifically those operated by Defendant Treetop), Waffle House and the franchisee entered into an arrangement governed by a series of agreements, including a Franchise Policy Agreement ("FPA"), a "Top Tier Lease," a "Bottom Tier Lease," and a separate franchise agreement for each individual restaurant. The FPA governs the overall relationship with respect to these restaurants and is the dominant agreement. The real estate occupied by these restaurants is often owned by the franchisee and is leased to Waffle House pursuant to the "Top Tier Lease." The real estate is then leased back to the franchisee by Waffle House pursuant to the "Bottom Tier Lease." Through the foregoing arrangement, Waffle House retains a long term legal interest in the location to ensure that it remains a Waffle House location for so long as it deems appropriate, while the franchisee retains actual ownership of the real estate. Also, as part of the foregoing arrangement, at Waffle House's demand or request, the restaurants must be rebuilt after 30 years. The present action involves four restaurants that are at least 30 years old (two are 38 years old and one is 40 years old) and need to be rebuilt, as explained below.

2.

Waffle House is seeking to enforce its contractual right to rebuild four Waffle House restaurants. Under the terms of the FPA originally entered into between Waffle House and Treetop (the original franchisee), Waffle House has the right to demand that Waffle House restaurants that are at least 30 years old be rebuilt. Further, Waffle House has the right to complete the rebuilding itself if, as in this case, the land owner, the building owner, and the franchisee operator have declined to complete the rebuild. Treetop expressly acknowledged Waffle House's right to complete the rebuild under these circumstances in the FPA and in the Bottom Tier Leases, which incorporate this obligation from the FPA. The four Waffle House restaurants at issue are more than 32 years old and need to be rebuilt, and it is important for the Waffle House® brand and for the public that Waffle House be permitted to rebuild these restaurants in order to maintain its quality standards and the integrity of its system of restaurants and to protect the goodwill in its trademarks and service marks.

3.

Ezell[1] contends that Waffle House is not permitted to rebuild the restaurants because of a sublease Treetop entered into many years later with a third party franchisee operator, and Ezell has threatened Waffle House with an action for trespass if Waffle House attempts to enter onto the premises to undertake the rebuild. Waffle House, however, is not a party to that sublease and has the contractual right to undertake the rebuild. Therefore, Waffle House is seeking a declaratory judgment that it has the right to rebuild the restaurants at issue, as well as a preliminary and permanent injunction enjoining Ezell from preventing Waffle House from entering the property to begin demolition and rebuilding. In addition, Waffle House is seeking a declaration that upon completion of the rebuilding, it is entitled to a rent reduction in accordance with the terms of the FPA with Treetop as incorporated into the Top Tier Leases.

[1] As explained below, upon information and belief, on or about July 26, 1999, Treetop was liquidated and all assets, rights, liabilities and obligations of Treetop under the leases and subleases were distributed to and assumed by Ezell, LLC, E.E.E., LLC, W.C. Ezell, LLC, and J.C. Ezell, LLC.

**PARTIES, JURISDICTION, AND VENUE**

4.

Waffle House is a corporation organized under the laws of the State of Georgia, with its principal place of business at 5986 Financial Drive, Norcross, Georgia 30071.

5.

Treetop is a corporation organized under the laws of the State of Tennessee, with its principal place of business at 4 Perdido Point Drive, Orange Beach, Alabama 36561. Treetop is subject to the jurisdiction of this Court and may be served through its registered agent, William E. Ezell, III, 114 Heady Drive, Nashville, Tennessee 37205.

6.

Ezell, LLC is a limited liability company organized under the laws of the State of Nevada. Its managing member is William E. Ezell, III, who upon information and belief is a citizen of Tennessee. Upon information and belief, all members of Ezell, LLC are citizens of states other than Georgia. Ezell, LLC may be served through its registered agent, The Corporation Trust Company of Nevada, 311 South Division Street, Carson City, Nevada 89703.

7.

J.C. Ezell, LLC is a limited liability company organized under the laws of the State of Nevada. Its managing member is William E. Ezell, III, who upon information and belief is a citizen of Tennessee. Upon information and belief, all members of J.C. Ezell, LLC are citizens of states other than Georgia. J.C. Ezell, LLC may be served through its registered agent, The Corporation Trust Company of Nevada, 311 South Division Street, Carson City, Nevada 89703.

8.

E.E.E., LLC is a limited liability company organized under the laws of the State of Nevada. Its managing member is William E. Ezell, III, who upon information and belief is a citizen of Tennessee. Upon information and belief, all members of E.E.E., LLC are citizens of states other than Georgia. E.E.E., LLC may be served through its registered agent, The Corporation Trust Company of Nevada, 311 South Division Street, Carson City, Nevada 89703.

9.

W.C. Ezell, LLC is a limited liability company organized under the laws of the State of Nevada. Its managing member is William E. Ezell, III, who upon information and belief is a citizen of Tennessee. Upon information and belief, all members of W.C. Ezell, LLC are citizens of states other than Georgia. W.C. Ezell,

LLC may be served through its registered agent, The Corporation Trust Company of Nevada, 311 South Division Street, Carson City, Nevada 89703.

10.

Subject matter jurisdiction exists under 28 U.S.C. §§ 1332 and 2201. The amount in controversy exceeds $75,000, exclusive of interest and costs, and the matter is between citizens of different states.

11.

Jurisdiction and venue are proper in this Court because Treetop and Waffle House agreed in section 21 of the Bottom Tier Leases and section 20 of the Top Tier Leases that any litigation concerning the leases shall be brought in, among other places, the United States district court for the state and county where Waffle House maintains its general office (*i.e.*, Norcross, Georgia). Venue is also proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in Norcross, Georgia, where Waffle House is located. Treetop and Waffle House agreed in section 21 of the Bottom Tier Leases and section 20 of the Top Tier Leases that the leases were accepted in Norcross, Georgia, where Waffle House is located.

## FACTUAL BACKGROUND

### The Franchise Policy Agreement

12.

On December 29, 1988, Waffle House, Waffle House Holding Co., Inc.[2] and Treetop entered into the FPA. A true and correct copy of the FPA is attached hereto as Exhibit A.

13.

Pursuant to the FPA, Waffle House granted Treetop the exclusive right to develop Waffle House restaurants in 33 Alabama counties, 28 Mississippi counties, and 41 Tennessee counties. Treetop eventually grew to operate 103 Waffle House® restaurants under the FPA by 1999.

14.

Under the Purpose, Effect and Consideration section of the FPA, Waffle House and Treetop agreed that: "To the extent that the terms in This Agreement conflict with any existing Franchise Agreements, Area Development Agreement, or other agreements, This Agreement will supersede and control."

15.

Section XII.E of the FPA, described as "Replacement of Restaurant Buildings" sets forth the following in subsection 1:

---

[2] Waffle House Holding Co., Inc. was merged into Waffle House.

> The restaurant building will be replaced at any time after 30 years as Waffle House deems necessary. Subsequent replacements will be made as Waffle House deems necessary at any time after 30 years from the immediate prior replacement. The owner of the building will have the first option to replace the building. Should the owner of the building decline, the owner of the land shall have the second option to replace the building and if the owner of the land declines, the Franchisee Operator at that time (Franchisee Operator) shall have the third option to replace the building. Should the owner of the building, the owner of the land, and the Franchisee Operator decline to replace the building, Waffle House may do so.

16.

The FPA, the Top Tier Leases and the Bottom Tier Leases were all negotiated at arms-length and reflect a practical balancing of interests between a restaurant's land owner, the franchisor (Waffle House), and the Franchisee Operator. Their terms recognize the shared interests that all these parties have in establishing a sound economic foundation for the Franchisee Operator as the entity whose operations would generate all the cash flow to support the payment of rent, royalties and operating expenses. Their terms also reflect the desire of the parties to establish an economic foundation built not just for the short term, but for the long term contemplated under the related agreements (up to 165 years under the Top Tier Lease). In particular, section XII.A.1 of the FPA states that

> In order to ensure that economically sound or operationally viable or competitively necessary units remain in the system so long as Waffle House determines

> that their continued operation makes good business sense, and to ensure the availability of future sites and the development of a territory to its maximum potential, Waffle House will perform all real estate services for Franchisee, including site location, negotiation of the transaction, whether it be lease or purchase, and, if Franchisee desires, actual development of the improvement.

17.

Each party under these agreements therefore made several material long term commitments and promises to each other in the FPA, the Top Tier Lease, and the Bottom Tier Lease. For example, Waffle House agreed that it would never increase the royalty fee for any new units developed by the franchisee after December 29, 1988 (Article II of FPA), that the royalty fee paid during any renewal term would remain the same as charged during the original term of a franchise agreement (Article II of FPA), and that it would not charge the franchisee a new franchise fee, renewal fee, or fee of any other nature for renewal of a Franchise Agreement. Waffle House also agreed for the long term that it would purchase or lease and then develop, at its sole cost and expense, any approved site for the franchisee (Article XII.C.1 and XII.D.1 of the FPA) and that, in either such event, it would accept as rent from that franchisee pursuant to an agreed upon formula for calculating rent for up to 165 years (Article XII.C.1(a) and (b) of the FPA). In essence, Waffle House agreed to finance the franchisee's growth for the

next 100+ years. But Waffle House also agreed to allow the franchisee or a related entity to purchase or lease the site itself and enter into a Top Tier Lease and a Bottom Tier Lease for the operation of the site (Article XII.C.3, XII.C.4 and XII.D.2 of the FPA).

18.

Article XII.E of the FPA (entitled “Replacement of Restaurant Buildings”), section 1 of the Top Tier Leases, and section 1 of the Bottom Tier Leases are **central** to the long term nature of these agreements, reflecting the balancing of and shared interests described above and the long term commitments and promises the parties made to each other. These provisions recognize that for the benefit of all the parties, the building might need to be replaced at some point after thirty (30) years of operating as a 24 hours per day\7 days per week\365 days per year restaurant. These provisions then set in stone the rent that would be paid to the land owner (whether it be Waffle House, the Franchisee Operator or one of their related entities) and the rent that would be paid by the party that funds the replacement of the building. In this manner, all the parties would be making long-term commitments and promises to each other, ones that could be relied upon for planning and financing of future developments. These terms provided as follows, in short:

- whether it be the land owner, the building owner, the Franchisee Operator or Waffle House that chooses to exercise the option to replace the building, the parties agreed that the party funding that rebuilding would earn an annual building rental equal to the greater of (a) the cost of the replacement building multiplied by a bi-annually established finance rate (called Base Percentage) or (b) 3.6% of annual net sales (Article XII.E.2 of the FPA); and
- after the replacement of the improvements by a party other than the land owner, whether that land owner be Waffle House, Franchisee Operator or any of their related entities, the FPA specifically provides that the subject lease for land and building be modified to reflect a ground lease only and the annual rental due that land owner be reduced to the greater of (a) 40% of the previous annual base rental (i.e. the base rent due prior to replacement of the building) or (b) 2.4% of annual net sales (Article XII.E.4 of the FPA).

**The Top Tier Leases**

19.

In accordance with the FPA, on December 29, 1988, Treetop and Waffle House also entered into a Top Tier Lease whereby Treetop leased to Waffle House "that certain property . . ., together with all buildings, structures and all other improvements thereof and at any time during the original term of this Lease or extensions or renewals hereof erected, constructed or situated upon said land of

any part thereof . . . ." The leased property is located at Waffle House #78, 3421 McFarland Boulevard, Tuscaloosa, Alabama 36867 ("Unit 78"). Unit 78 opened on December 1, 1970, and is now more than 40 years old. A true and correct copy of the Top Tier Lease for Unit 78 is attached hereto as Exhibit B.

20.

Waffle House and Treetop entered into Top Tier Leases for three other Waffle House restaurants located at Waffle House #150, U.S. Highway 82 By-Pass West & AL69, Northpoint, Alabama 35476 ("Unit 150"), Waffle House #159, I-65 & AL 185, Greenville, Alabama 36037 ("Unit 159"), and Waffle House #346, I-65 & US 31, Alabastor, Alabama 35007 ("Unit 346"). Each of these Top Tier Leases is substantially identical to the Top Tier Lease for Unit 78. Unit 150 opened on June 27, 1973 and is now more than 38 years old; Unit 159 opened on April 17, 1973 and is now more than 38 years old; and Unit 346 opened on November 8, 1978 and is now more than 32 years old. True and correct copies of the Top Tier Leases for Unit 150, Unit 159, and Unit 346 are attached hereto as Exhibits C, D, and E, respectively.

21.

Section 1 of the Top Tier Leases provides, among other terms:

> Rental as described herein may be subject to modification pursuant to the building replacement

> provisions of Section XII.E. of the Franchise Policy Agreement between [Treetop] and Waffle House Holding Co., Inc. dated 12/29/88, (FPA). Lessor herein, by acceptance of the Lease agrees to any rental modifications contained in the FPA.

**The Bottom Tier Leases**

22.

Contemporaneously with entering into the FPA and the Top Tier Lease, Waffle House and Treetop also entered into a Bottom Tier Lease, whereby Waffle House leased back to Treetop the property located at Unit 78. A true and correct copy of the Bottom Tier Lease for Unit 78 is attached hereto as Exhibit F.

23.

Waffle House and Treetop also entered into Bottom Tier Leases for Unit 150, Unit 159, and Unit 346, whereby Waffle House leased back to Treetop the property for each of those units. The Bottom Tier Leases for Unit 150, Unit 159, and Unit 346 are substantially identical to the Bottom Tier Lease for Unit 78. True and correct copies of the Bottom Tier Leases for Unit 150, Unit 159, and Unit 346 are attached hereto as Exhibits G, H, and I, respectively.

24.

Section 1 of the Bottom Tier Leases provides, among other terms:

> Rental as described herein may be subject to modification pursuant to the building replacement provisions of Section XII.E. of the Franchise Policy

> Agreement between [Treetop] and Waffle House Holding Co., Inc., dated 12/29/88, [sic] (FPA) Lessor herein, by acceptance of the Lease, agrees to any rental modification contained in the FPA. (A copy of the applicable provisions of Section XII.E. of the FPA is attached hereto as Exhibit B.)

**The Assignment and Assumption**

25.

In April, 1999, Treetop sold all of its 103 operating Waffle House® restaurants and related (non-real estate) assets to SouthEast Waffles, LLC ("SEW") for an aggregate purchase price in excess of $21,000,000. Notwithstanding the sale of its other assets to SEW, Treetop continued to own all thirty five (35) parcels of real estate occupied by Waffle House® restaurants that it had owned prior to the asset sale to SEW. With respect to these 35 parcels of real estate, Treetop, as the lessee under the Bottom Tier Leases, subleased those properties to SEW.

26.

To implement this transfer, on April 29, 1999, Treetop and SEW executed an Assignment and Assumption (FPA) (the "Assignment"), whereby Treetop sold, assigned, transferred and conveyed unto SEW all of Treetop's right, title and interest under the FPA. SEW assumed all of the obligations of Treetop arising under the FPA. A true and correct copy of the Assignment is attached hereto as Exhibit J.

27.

A consent was executed as part of the Assignment whereby Waffle House consented to the assignment of the FPA by Treetop to SEW (the "Assignment Consent"). The Assignment Consent sets forth that "Treetop and [SEW] each acknowledge and agree that less and except for the express provisions set forth above, that Waffle House, by granting its consent hereunder, does not waive or impair any rights, title, powers or privileges that it has, or may have, now or in the future under the FPA." The Assignment Consent is part of Exhibit J.

**The Sublease Consent**

28.

Also on April 29, 1999, Waffle House and Treetop made and entered into a Consent (the "Sublease Consent"). A true and correct copy of the Sublease Consent is attached hereto as Exhibit K.

29.

Through the Sublease Consent, Waffle House "acknowledge[d] the terms of paragraph 17 in those Subleases and agree[d] to be bound by the terms thereof," but did not agree to be bound by any other terms of the Subleases. To that end, Waffle House also "waive[d] any right of first refusal, right to purchase or similar right it may have in any lease or other agreement between Waffle House and Treetop relating to any of the Restaurants arising out the subleasing of the

Restaurants by Treetop to [SEW] . . . ," but did not agree to waive any other terms in any of the agreements between Waffle House and Ezell. The Sublease Consent also provides:

> Treetop and [SEW] each acknowledge and agree that, less and except for []the express provisions set forth above, Waffle House, by granting its consent hereunder, does not waive or impair any rights, title, powers or privileges that it has, or may have, now or in the future under the Waffle House Leases [i.e., the Bottom Tier Leases and the Top Tier Leases] or the Third Party Agreements.

**The Subleases**

30.

As contemplated by the Sublease Consent, on April 29, 1999, Treetop entered into a sublease with SEW (the "Sublease"), whereby Treetop subleased Unit 78 to SEW.

31.

Treetop and SEW also entered into subleases for Unit 150, Unit 159, and Unit 346, and each of these subleases is substantially identical to the Sublease for Unit 78 (the Sublease and the substantially similar subleases for Unit 150, Unit 159, and Unit 346 are referred to collectively as the "Subleases").

32.

Section 3.(b) of the Subleases provides:

> In the event [Treetop] is unwilling to reconstruct the restaurant improvements as required by the Franchisor it shall notify [SEW] and [SEW], at its sole cost and expense, shall reconstruct said improvements and, in such event, the annual rental for the next five (5) years of the term of the [Bottom Tier Leases], commencing when the improvements are completed, and occupied, shall be equal to the rental for the twelve months period immediately preceding the reconstruction. . . . Thereafter, during the remaining term of the [Bottom Tier Leases], the fixed annual rental shall be the fixed annual rental during the previous five year term adjusted based on the percentage change in the Consumer Price Index . . . during such five year period . . . .

33.

Waffle House is not a party to or otherwise bound by the Subleases, except as expressly provided for in the Sublease Consent. In particular, and without limiting the generality of the foregoing, Waffle House did not agree to be bound by section 3.(b) of the Subleases or to waive any of its rebuild rights under the FPA or the Bottom Tier Leases.

**The Ezell Entities**

34.

Upon information and belief, on or about July 26, 1999, Treetop was liquidated and all assets, rights, liabilities and obligations of Treetop under the Top Tier Leases, the Bottom Tier Leases, and the Subleases and otherwise with respect to the four restaurant properties were distributed to and assumed by Ezell, LLC,

E.E.E., LLC, W.C. Ezell, LLC, or J.C. Ezell, LLC, which became the current landlord under the Top Tier Leases and Subleases and the Lessee under the Bottom Tier Leases.

**Mid South Waffles**

35.

In 2008, SEW filed for bankruptcy protection. In connection with the resolution of this bankruptcy proceeding, Mid South Waffles, Inc. ("MSW") acquired SEW's interests in the FPA and the individual franchise agreements. MSW also acquired SEW's interests in the Subleases. MSW is a wholly-owned subsidiary of Waffle House.

**Unit 78, Unit 150, Unit 159 and Unit 346 Need to Be Rebuilt.**

36.

Waffle House has determined that in accordance with section XII.E of the FPA, section 1 of the Top Tier Leases, and section 1 of the Bottom Tier Leases, for reasons described in greater detail below, the Unit 78, Unit 150, Unit 159, and Unit 346 restaurants (the "Subject Restaurants") need to be rebuilt.

37.

Ezell, as building owner and land owner, has declined the option under section XII.E.1 of the FPA to rebuild the Subject Restaurants. MSW, as

Franchisee Operator, has also declined the option under section XII.E.1 to rebuild the Subject Restaurants.

38.

In accordance with section XII.E.1 of the FPA, Waffle House has exercised its option to rebuild the Subject Restaurants as soon as practicable. Through correspondence and during meetings between the parties, Waffle House has notified Ezell of its intent to exercise its rebuild option.

39.

Each of the Subject Restaurants is subject to the Subleases. Ezell contends that Waffle House is not entitled to exercise its option to rebuild the Subject Restaurants because of section 3.(b) of the Subleases. Ezell contends that under section 3.(b) of the Subleases, it can compel MSW to complete the rebuild thereby eliminating Waffle House's option to complete the rebuild under section XII.E.1 of the FPA and section 1 of the Top Tier Leases and the Bottom Tier Leases.

40.

However, Waffle House was not a party to and is not otherwise bound by the Subleases, except for obligations it expressly assumed in the Sublease Consent. In particular, Waffle House did not agree to be bound by section 3.(b) of the Subleases or to waive its rebuild rights under the terms of the FPA, the Top Tier

Leases and the Bottom Tier Leases. Moreover, the FPA provides that "[t]o the extent that the terms in This Agreement conflict with any existing Franchise Agreements, Area Development Agreement, or other agreements, This Agreement will supersede and control." Therefore, Waffle House contends that the FPA, and the Top Tier Leases and the Bottom Tier Leases (which incorporate section XII.E. of the FPA) are the controlling agreements, and the Subleases do not affect Waffle House's rights *vis-à-vis* Ezell.

41.

Under the Assignment Consent, Treetop specifically acknowledged and agreed that Waffle House did "not waive or impair any rights, title, powers or privileges that is has, or may have, now or in the future under the FPA."

42.

Under the Sublease Consent, Treetop specifically acknowledged and agreed that "Waffle House, by granting its consent hereunder, does not waive or impair any rights, title, powers or privileges that it has, or may have, now or in the future under the Waffle House Leases [*i.e.*, the Bottom Tier Leases and the Top Tier Leases] or the Third Party Agreements."

43.

By letter dated June 24, 2011, Ezell, as owner of the land and buildings, stated through its attorney that "if [MSW] and [Waffle House] do not (i) acknowledge the applicability of Section 3(b) of the [Subleases] and (ii) agree to be bound accordingly, then any attempt by [Waffle House], [MSW] or any other contractor, agent, employees, representative of [Waffle House] or [MSW], to enter the Alabama premises for demolition purposes, shall be treated as a trespass after warning." The letter also cautioned Waffle House to "let this letter constitute your warning that failing to acknowledge (i) and (ii) above may result in a termination of the top tier leases for the four Alabama sites for which rebuild obligations have been requested." A true and correct copy of the June 24, 2011 letter is attached hereto as Exhibit L.

44.

There exists an actual controversy as to whether section XII.E.1 of the FPA as incorporated in the Top Tier Leases and the Bottom Tier Leases or section 3(b) of the Subleases controls which entity may or must rebuild the Subject Restaurants. Waffle House seeks a declaration that section XII.E.1 of the FPA and section 1 of the Top Tier Leases and the Bottom Tier Leases control and therefore Waffle House has the right to begin rebuilding the Subject Restaurants immediately in

accordance with the terms of the FPA and the Top Tier Leases and the Bottom Tier Leases.

45.

The Subject Restaurants are past their prime and, although they remain in operable condition, the interiors and exteriors must be updated. Waffle House strives to maintain a consistent and pleasant experience for customers at its restaurants and these qualities create and maintain value in the Waffle House® brand. The purpose of section XII.E of the FPA is to ensure that Waffle House's goodwill is not adversely affected by outdated restaurants.

46.

If Waffle House is not allowed access to the properties to begin rebuilding the Subject Restaurants in the immediate future, Waffle House's goodwill will suffer irreparable harm.

47.

The sooner Waffle House can begin rebuilding the Subject Restaurants, the sooner the new buildings will be completed for the Waffle House restaurants to be re-opened. Customer visits will likely increase at the rebuilt restaurants as customers realize the quality of the experience of dining at a fresh and updated Waffle House® restaurant.

48.

Following Waffle House's rebuilding of the Subject Restaurants, Waffle House is entitled to a rent reduction in accordance with section XII.E.4 of the FPA and section 1 of the Top Tier Leases.

**<u>COUNT I</u>**
**Declaratory Judgment**

49.

Waffle House realleges and incorporates by reference, as if set forth fully herein, the allegations contained in paragraphs 1-48 of this complaint.

50.

There is an actual controversy between Waffle House and Ezell concerning their respective rights and duties under the FPA regarding whether section XII.E.1 of the FPA as incorporated in section 1 of the Top Tier Leases and the Bottom Tier Leases or section 3(b) of the Subleases controls which entity may or must complete the rebuilding of the Subject Restaurants and the effect on rent due going forward.

51.

Waffle House seeks a declaration that section XII.E.1 of the FPA and section 1 of the Top Tier Leases and the Bottom Tier Leases control and are not affected by section 3(b) of the Subleases and therefore Waffle House has the right

to begin rebuilding the Subject Restaurants in accordance with the express terms of the FPA and the Top Tier Leases and the Bottom Tier Leases.

52.

Waffle House further seeks a declaration that upon completing the rebuild of the Subject Restaurants, it is entitled to a reduction of rent under the terms of the Top Tier Lease in accordance with section 1 of the Top Tier Lease and section XII.E.4 of the FPA.

**COUNT II**
**Preliminary and Permanent Injunction**

53.

Waffle House realleges and incorporates by reference, as if set forth fully herein, the allegations contained in paragraphs 1-52 of this complaint.

54.

In accordance with section XII.E.1 of the FPA, Waffle House has given notice to Ezell of its exercise of the option to rebuild the Subject Restaurants as soon as practicable through correspondence and during meetings between the parties.

55.

Ezell has indicated that if Waffle House attempts to rebuild the Subject Restaurants, then Ezell will consider Waffle House's entering on the respective properties as a trespass after warning.

56.

Ezell has also indicated that if Waffle House attempts to rebuild the Subject Restaurants, then Ezell believes it has the right to terminate the Top Tier Leases for the Subject Restaurants.

57.

The Subject Restaurants need to be replaced in order for Waffle House to preserve and increase the value of its goodwill.

58.

If Waffle House is not permitted to begin rebuilding the Subject Restaurants as soon as practicable, Waffle House's goodwill will be irreparably harmed.

59.

Further, if Waffle House begins rebuilding the Subject Restaurants as soon as practicable, Waffle House will be irreparably harmed if Ezell asserts trespass actions against Waffle House.

60.

If Ezell attempts to terminate the Top Tier Leases, then there is a substantial likelihood that the Subject Restaurants will be closed permanently. Closure of the Subject Restaurants would cause harm to Waffle House because it would damage the Waffle House® brand and the reputation of its restaurant system. The public would also be harmed by the reduction in restaurant locations.

61.

A preliminary and permanent injunction enjoining Ezell from preventing Waffle House from exercising its option to rebuild the Subject Restaurants would not be adverse to the public interest. To the contrary, the public would benefit from newer and more modern Waffle House restaurant locations.

62.

Waffle House seeks a preliminary and permanent injunction prohibiting Ezell from interfering with Waffle House's rights to rebuild the Subject Restaurants.

63.

Waffle House further seeks a preliminary and permanent injunction enjoining Ezell from

(1) filing trespass actions against Waffle House after Waffle House begins rebuilding the Subject Restaurants pursuant to its option under section XII.E.1 of the FPA as incorporated in section 1 of the Top Tier Leases and the Bottom Tier Leases;

(2) otherwise directly or indirectly preventing Waffle House from exercising its rebuild rights under the FPA and the Top Tier Leases and the Bottom Tier Leases; and

(3) terminating the Top Tier Leases for the Subject Restaurants after Waffle House begins rebuilding the Subject Restaurants pursuant to its option under section XII.E.1 of the FPA as incorporated in section 1 of the Top Tier Leases and the Bottom Tier Leases.

WHEREFORE, Plaintiff prays that the Court grant the following relief:

(a) A declaration that section XII.E.1 of the FPA and section 1 of the Top Tier Leases and the Bottom Tier Leases (incorporating section XII.E.1 of the FPA) control and are not affected by section 3(b) of the Subleases and therefore Waffle House has the right to begin rebuilding the Subject Restaurants immediately in accordance with the express terms of the FPA and the Top Tier Leases and the Bottom Tier Leases;

(b) A declaration that upon completing the rebuild of the Subject Restaurants, Waffle House is entitled to a reduction of rent under the terms of the Top Tier Leases in accordance with section 1 of the Top Tier Leases and section XII.E.4 of the FPA;

(c) Preliminary and permanent injunctive relief enjoining Ezell from interfering with Waffle House's rights to rebuild the Subject Restaurants;

(d) Preliminary and permanent injunctive relief enjoining Ezell from

(1) filing trespass actions against Waffle House after Waffle House begins demolition and rebuilding of the Subject Restaurants pursuant to its option under section XII.E.1 of the FPA as incorporated in section 1 of the Top Tier Leases and the Bottom Tier Leases;

(2) otherwise directly or indirectly preventing Waffle House from exercising its rebuild rights under the FPA and the Top Tier Leases and the Bottom Tier Leases; and

(3) terminating the Top Tier Leases for the Subject Restaurants after Waffle House begins demolition and rebuilding of the Subject Restaurants pursuant to its option under section XII.E.1

of the FPA as incorporated in section 1 of the Top Tier Leases and the Bottom Tier Leases; and

(e) Such other and further relief as the Court may deem just and proper.

DATED: July 13, 2011.

Respectfully submitted,

s/ Stephen E. Hudson

Stephen E. Hudson
Georgia Bar No. 374692
Robert E. Buckley
Georgia Bar No. 140280

KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
Facsimile: (404) 815-6555
shudson@kilpatricktownsend.com
robuckley@kilpatricktownsend.com

*Attorneys for Plaintiff*